Pamela DANCA, Joseph Danca,
Jr., Katelyn J. Danca and Lisa
A. Danca, Plaintiff, Appellants,

v.

PRIVATE HEALTH CARE SYSTEMS,
INC., and Phoenix Home Life Mutual
Insurance Co., Defendants, Appellees.

No. 98–1754.

United States Court of Appeals,
First Circuit.

Heard April 9, 1999.

Decided Aug. 2, 1999.

**2**

Leonard F. Zandrow, Jr., with whom John W. Brister and Brister & Zandrow, L.L.P. were on brief, for appellants.

Nicholas P. Hansen, with whom Van Aaron Hughes and Ireland, Stapleton, Pryor & Pascoe, P.C. were on brief, for Private Healthcare Systems, Inc.

Albert Zakarian, with whom Day, Berry & Howard LLP was on brief, for Phoenix Home Life Mutual Insurance Company.

Before STAHL, Circuit Judge, BOWNES, Senior Circuit Judge, and LIPEZ, Circuit Judge.

STAHL, Circuit Judge.

In this difficult case, plaintiffs Pamela Danca and members of her family (collectively, plaintiffs) seek to hold defendants-appellees Phoenix Home Life Mutual Insurance Company (Phoenix) and Private Healthcare Systems Inc. (PHSI) responsible for allegedly negligent medical decisionmaking in the course of a precertification requirement apparently mandated by an ERISA-governed health plan. After careful consideration, we affirm the decision of the district court that the state law claims be dismissed.

## I.

### Introduction

Because the record is largely undeveloped, we cull our factual recitation from the district court's opinion and the appellate briefs, as supplemented by the state court complaint.

Pamela Danca is a beneficiary of a health insurance policy governed by the Employee Retirement Income Security Act (ERISA), 29 U.S.C. § 1001 *et seq.* Phoenix is the insurance company that provided the policy and PHSI is the utilization review firm hired by Phoenix to assess physicians' recommendations for a proposed course of medical treatment for plan beneficiaries. Such assessments, called precertification or prospective utilization review,[1] are apparently required

---

1. "Utilization review refers to an external evaluation of the appropriateness of a given course of treatment based upon established clinical criteria." *Andrews–Clarke v. Travelers Ins. Co.,* 984 F.Supp. 49, 50 n. 9 (D.Mass. 1997) (citing *Dukes v. U.S. Healthcare, Inc.,* 57 F.3d 350, 352 n. 1 (3d Cir.1995) and *Corcoran v. United HealthCare Inc.,* 965 F.2d 1321, 1323 (5th Cir.1992)). The utilization review firm in a prospective system plays an

by the terms of the ERISA plan. According to defendants, failure to obtain precertification may result in reduced payment (or no payment at all) for the services for which precertification should have been sought. In such an event, the beneficiary would be liable for the cost of the treatment.

Danca, who had a long history of mental illness that had been treated on occasions prior to those in dispute here, sought care for a new episode of mental illness on September 21, 1994. Her physician recommended inpatient psychiatric care at McLean Hospital. His recommendation was apparently based on the fact that Danca had previously been successfully treated at McLean. After consultation with the physician regarding this recommendation and its rationale, defendants denied precertification for treatment at McLean and instead precertified Danca's admission to Emerson Hospital.

The precise nature of the consultation and the extent of defendants' participation in the medical decisionmaking is not clear on the record before us. Typically, utilization review firms have a set of guidelines and protocols that guide such decisionmaking, *see Andrews–Clarke v. Travelers Ins. Co.*, 984 F.Supp. 49, 50 n. 9 (D.Mass.1997), and we therefore assume that was probably the case here. Thus, it appears that defendants decided, in light of Danca's medical record and after some consultation with her treating physician, that Emerson Hospital was appropriate for her condition.

According to plaintiffs, Emerson Hospital turned out to be inappropriate and provided Danca with inadequate care.

Among other things, plaintiffs claim that Emerson failed to provide treatment similar to that which had proven helpful at McLean Hospital for earlier episodes of her mental illness. Danca subsequently required additional hospitalization. She was treated at a third facility, where the care was also alleged to have been inadequate. Danca, allegedly as a result of the totality of her inadequate care, attempted suicide by self-immolation, causing severe burns and permanent disfiguring injuries.

Plaintiffs filed suit in Massachusetts Superior Court against numerous physicians and the health care facilities at which they allege Danca was inadequately treated. Plaintiffs also filed suit against Phoenix and PHSI.

Plaintiffs amended the complaint once in the state court. The amended complaint alleged a number of ways in which the actions or inactions of defendants resulted in Danca's injuries.[2] Defendants removed the suit to federal district court, claiming federal question jurisdiction. Plaintiffs never challenged the removal on jurisdictional grounds and the district court apparently accepted the removal as proper.

Plaintiffs subsequently amended the complaint again. Phoenix and PHSI then moved to dismiss the state law claims against them, asserting that the claims were preempted by ERISA. *See* 29 U.S.C. § 1144(a), ERISA § 514 (ERISA "shall supersede any and all State laws insofar as they may now or hereafter relate to any employee benefit plan.") (hereinafter, "ERISA § 514 Preemption"). The district court agreed and dismissed these claims.[3] After further procedural machi-

---

active role in the course and scope of medical treatment. *See* J. Scott Andresen, *Is Utilization Review the Practice of Medicine?*, 19 J. Legal Med. 431, 435 (1998).

**2.** The counts, more or less identical as to each defendant, may be summed up as follows:

1) failure to appropriately train and supervise medical personnel responsible for assessing and evaluating precertification claims;

2) failure to ensure that medical decisions (evaluation of treatment requests) in the course of precertification were made and overseen by capable personnel in a competent manner;

3) failure to follow the recommendation of Danca's treating physician; and

4) negligent infliction of emotional distress.

**3.** Finding itself with no independent basis for jurisdiction over the claims against the defendant physicians and health care facilities, the

nations unimportant for the purpose of this opinion, Danca·filed a timely notice of appeal from the order of dismissal.

## II.

### Jurisdiction of the District Court

A threshold issue in this case, as in every case, is subject matter jurisdiction. Because of the importance of the issue, and because the district court apparently did not directly address the question, we review it at some length. Our focus is on the doctrine of complete preemption, which controls the question of subject matter jurisdiction. We find the case was properly removed to the district court.

Under our dual-sovereign system, the plaintiff is the "master to decide what law he will rely upon." *Fair v. Kohler Die & Specialty Co.*, 228 U.S. 22, 25, 33 S.Ct. 410, 57 L.Ed. 716 (1913). Plaintiff has the prerogative to rely on state law alone although both federal and state law may provide a cause of action. *See Caterpillar Inc. v. Williams*, 482 U.S. 386, 392, 107 S.Ct. 2425, 96 L.Ed.2d 318 (1987). Nevertheless, within thirty days of receipt of proper service of the complaint and summons, *see Murphy Bros., Inc. v. Michetti Pipe Stringing, Inc.*, 526 U.S. 344, ——––——, 119 S.Ct. 1322, 1328–30, 143 L.Ed.2d 448 (1999), defendants may remove an action from the state court in which it was filed to the appropriate federal district court, provided that the defendant can show some basis for federal jurisdiction, *see* 28 U.S.C. §§ 1441(a) & 1446(a). The removal statute does not in itself create jurisdiction. Indeed, removal statutes are strictly construed, *see Shamrock Oil & Gas Corp. v. Sheets*, 313 U.S. 100, 108–09, 61 S.Ct. 868, 85 L.Ed. 1214 (1941), and defendants have the burden of showing the federal court's jurisdiction, *see BIW Deceived v. Local S6, Industrial Union of Marine and Shipbuilding Workers of*

America, *IAMAW District Lodge 4*, 132 F.3d 824, 831 (1st Cir.1997). Defendants here claim federal question jurisdiction as the basis for removal. *See* 28 U.S.C. §§ 1446(a) & 1331. Defendants must therefore make a "colorable" showing that a basis for federal jurisdiction exists. *BIW Deceived*, 132 F.3d at 832; *see also Burns v. Windsor Ins. Co.*, 31 F.3d 1092, 1097 (11th Cir.1994) (remanding where federal jurisdiction not clearly shown).

Jurisdiction is normally ascertained from the face of the state court complaint that triggered the removal. *See Franchise Tax Bd. v. Construction Laborers Vacation Trust*, 463 U.S. 1, 9–10, 103 S.Ct. 2841, 77 L.Ed.2d 420 (1983) (describing the "well-pleaded complaint" rule). Here, the state court complaint alleged only causes of action under state law. On its face, then, the complaint presents no federal question.

But there is an exception to this practice of focusing on the face of the complaint. Where a claim, though couched in the language of state law, implicates an area of federal law for which Congress intended a particularly powerful preemptive sweep, the cause is deemed federal no matter how pleaded. *See Metropolitan Life Ins. Co. v. Taylor*, 481 U.S. 58, 63–64, 107 S.Ct. 1542, 95 L.Ed.2d 55 (1987). This exception to the well-pleaded complaint rule is called "complete preemption."

We pause here to emphasize the difference between complete preemption, a concept associated with jurisdiction, and the affirmative federal defense of ERISA § 514 preemption. Standing alone, the likelihood or even certainty of defendants' raising a colorable ERISA § 514 preemption defense is no basis for federal jurisdiction. *See Taylor*, 481 U.S. at 64, 107 S.Ct. 1542 ("ERISA preemption, without more, does not convert a state law claim into an

court apparently exercised its discretion at this point to remand these claims to state

court. They form no part of this appeal.

action arising under federal law."). ERISA § 514 is not relevant to the complete preemption analysis; courts look instead only to ERISA § 502(a), *see Jass v. Prudential Health Care Plan*, 88 F.3d 1482 (7th Cir.1996) (referring to § 502 and not § 514 for complete preemption analysis); *Dukes v. U.S. Healthcare, Inc.*, 57 F.3d 350 (3d Cir.1995) (same); *Lupo v. Human Affairs Int'l, Inc.*, 28 F.3d 269 (2d Cir.1994) (same); *Tolton v. American Biodyne, Inc.*, 48 F.3d 937 (6th Cir.1995) (same), which contains ERISA's exclusive civil enforcement provisions, *see* 29 U.S.C. § 1132(a).

 To establish complete preemption, defendants must show that the state cause of action falls within the scope of ERISA § 502(a). *See Taylor*, 481 U.S. at 66, 107 S.Ct. 1542. For this to occur, the state law must be properly characterized as an "alternative enforcement mechanism" of ERISA § 502(a) or of the terms of an ERISA plan.[4] *See New York State Conf. of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*, 514 U.S. 645, 658, 115 S.Ct. 1671, 131 L.Ed.2d 695 (1995). ERISA § 502(a) provides for, *inter alia*, a

cause of action by a participant or beneficiary "to recover benefits due ... under the terms of the plan, to enforce ... rights under the terms of the plan, or to clarify ... rights to future benefits under the terms of the plan." 29 U.S.C. § 1132(a)(1)(B). It therefore follows that state law tort suits that allege the improper processing of a claim for benefits under an ERISA-covered plan, for example, fall within the scope of § 502(a). *See Pilot Life Ins. Co. v. Dedeaux*, 481 U.S. 41, 56, 107 S.Ct. 1549, 95 L.Ed.2d 39 (1987). But "Section 502(a) ... does not purport to reach every question relating to plans covered by ERISA." *Franchise Tax Bd.*, 463 U.S. at 25, 103 S.Ct. 2841. We must therefore look beyond the face of the complaint "to determine whether the real nature of the claim is federal, regardless of plaintiff's [state law] characterization." *Federated Dep't Stores, Inc. v. Moitie*, 452 U.S. 394, 397 n. 2, 101 S.Ct. 2424, 69 L.Ed.2d 103 (1981).

Although we recognize that the allegedly negligent decisionmaking and consultation at issue here may be characterized as medical in nature,[5] this fact alone does not

---

4. The fact that ERISA does not provide the *remedy* plaintiffs seek is not relevant; all that matters is that the *claim* be within the scope of § 502(a). *Cf. Pilot Life Ins. Co. v. Dedeaux*, 481 U.S. 41, 54–55, 107 S.Ct. 1549, 95 L.Ed.2d 39 (1987) (finding a *claim* for improper processing of benefits fell within § 502(a), even though the *remedy* sought was not authorized by ERISA).

5. Although prospective utilization review involves no traditional face-to-face clinical encounter, it is still quasi-medical in nature. It necessarily involves evaluation of data collected in such an encounter. *See* John D. Blum, *An Analysis of Legal Liability in Health Care Utilization Review and Case Management*, 26 Hous. L.Rev. 191, 199 (1989) ("The overriding incentive for [utilization review] may be cost containment, but the process itself is triggered by a medical evaluation of a particular case, an evaluation that requires a clinical judgment."). Functionally speaking, from the perspective of the patient, prospective utilization review has the same effect as a failure to treat. *See* Jeffrey E. Shuren, *Legal Accountability For Utilization Review in ERISA Health Plans*, 77 N.C. L.Rev. 731, 733 & 747 (1999);

*see also Corcoran*, 965 F.2d at 1332 ("By its very nature, a system of prospective decisionmaking influences the beneficiary's choice among treatment options to a far greater degree than the theoretical risk of disallowance of a claim facing a beneficiary in a retrospective system."). In effect, the utilization review firm ultimately may substitute its judgment for that of the treating physicians. *See* Andresen, *supra*, at 435. Prospective utilization review appears more analogous to a second opinion than to retrospective claims processing. It is therefore not surprising that other courts have agreed with the conclusion that the decisionmaking at issue is medical in nature. *See Corcoran*, 965 F.2d at 1331 (finding that utilization review decision was medical and included giving "medical advice," albeit in benefits context); *Murphy v. Board of Med. Exam'rs*, 190 Ariz. 441, 949 P.2d 530 (1997) (finding decision of physician performing utilization review constitutes the practice of medicine); *Long v. Great West Life & Annuity Ins. Co.*, 957 P.2d 823 (Wyo.1998) (distinguishing between medical decisionmaking and claims processing in the process of utilization review).

remove the state causes of actions from the scope of § 502(a). Nor does the fact that the allegedly negligent conduct was not in itself a final "benefits" determination,[6] but only part of a precertification decision, control. *See Terry v. Bayer Corp.*, 145 F.3d 28, 35 (1st Cir.1998) (when examining an ERISA § 502(a) claim, "[w]e must focus ... in the usual case ... on the determinations of the final decisionmaker [not the third-party administrator hired to evaluate medical basis of treatment requests].""). What matters, in our view, is that the conduct was indisputably part of the process used to assess a participant's claim for a benefit payment under the plan. As such, any state-law-based attack on this conduct would amount to an "alternative enforcement mechanism" to ERISA's civil enforcement provisions contained in ERISA § 502(a), 29 U.S.C. §. 1132(a), because "all suits brought by beneficiaries or participants asserting improper processing of claims under ERISA-regulated plans [should] be treated as federal questions governed by § 502(a)." *Pilot Life*, 481 U.S. at 56, 107 S.Ct. 1549. *Pilot Life*, for example, involved repeated terminations and reinstatements of disability benefits over the course of five years. *Id.* at 43, 107 S.Ct. 1549. Plaintiffs in that case alleged not simply an entitlement to benefits under the plan, but bad faith on the part of the insurance company in its conduct while arriving at its final benefits conclusions. *Id.* at 48, 107 S.Ct. 1549. Plaintiffs' claims here similarly attack the conduct—albeit conduct that is quasi-medical in nature—of the defendants in the course of processing a claim for benefits. We therefore find that defendants have made a colorable showing that plaintiffs' claims, particularly the allegations that defendants (1) failed to follow Danca's physician's recommendations and (2) failed to ensure that the evaluation of treatment requests in the course of precertification were made and overseen by capable personnel in a competent manner, are alternative enforcement mechanisms under ERISA § 502(a) and therefore completely preempted. *See Jass*, 88 F.3d at 1489; *see also Taylor*, 481 U.S. at 66, 107 S.Ct. 1542. They thus raise a federal question justifying removal. *See* 28 U.S.C. § 1441.[7]

## III.

### Jurisdiction on Appeal

Although plaintiffs filed the notice of appeal in this case, they now contest our jurisdiction. Plaintiffs hope that, if we stay the appeal until the state court has resolved the claims against the hospital and physician defendants, the law will have changed in their favor in the interim. At oral argument, plaintiffs' position proved not to be "jurisdictional" at all. Rather, it boiled down to this: that this court *may* exercise its discretion to stay this appeal

---

**6.** ERISA contains no definition of the term "benefits," nor has any circuit court, to our knowledge, attempted to define the term. *Cf. Dukes*, 57 F.3d at 356 (assuming without deciding that the term "benefits" means the medical care provided and not merely the plaintiffs' HMO membership). Nevertheless, the definition of an ERISA "plan" suggests that the term "benefits" is distinct from the care given. *See* 29 U.S.C. § 1002(1) (defining "employee welfare benefit plan" as "any plan, fund, or program ... to the extent that such plan, fund, or program was established or maintained .... for the purpose of providing ... medical, surgical or hospital care *or* benefits") (emphasis added). Furthermore, Justice Breyer has distinguished between the payment of money, which he characterizes as "benefits," *see Boggs v. Boggs*, 520 U.S. 833,

860, 117 S.Ct. 1754, 138 L.Ed.2d 45 (1997) (Breyer, J., dissenting) (characterizing the payment of benefits as "the writing of checks from [pension and welfare benefit] funds"), and the goods and services that the money purchases, which are not benefits, *cf. id.* (conceding that laws affecting such money payments "lie closer to ERISA's federal heart than do state laws that, say, affect those goods and services that ERISA benefit plans purchase"). We therefore conclude that "benefits" in this context, as in the pension context, are the monetary payments for medical services, not the services themselves.

**7.** The district court properly exercised supplementary jurisdiction over all other state law claims. *See* 28 U.S.C. § 1367.

pending the outcome of the state case. Even assuming plaintiffs' view on the law were correct, we would not exercise our discretion in this manner.

## IV.

### ERISA § 514 Preemption

■ ERISA preempts all state laws that "relate to" employee welfare benefit plans. *See* 29 U.S.C. § 1144(a). In its recent cases, the Supreme Court has made clear that ERISA preempts, *inter alia,* two kinds of state laws: (1) laws that amount to "alternative enforcement mechanisms" to those in ERISA § 502(a), *see New York State Conference of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.,* 514 U.S. 645, 658, 115 S.Ct. 1671, 131 L.Ed.2d 695 (1995) (citing *Ingersoll–Rand Co. v. McClendon,* 498 U.S. 133, 111 S.Ct. 478, 112 L.Ed.2d 474 (1990)); and (2) laws that present the threat of conflicting and inconsistent regulation that would frustrate uniform national administration of ERISA plans, *see id.* at 656–58, 115 S.Ct. 1671.

■ As we stated in our discussion of complete preemption, *supra* Part II, we find that the tort claims alleging negligence in defendants' (1) failing to follow Danca's physician's recommendations and (2) failing to ensure that the evaluation of treatment requests in the course of precertification were made and overseen by capable personnel in a competent manner, are alternative enforcement mechanisms under ERISA § 502(a). As such, they are both completely preempted, justifying removal, and preempted by ERISA § 514, justifying dismissal. *See Travelers,* 514 U.S. at 658, 115 S.Ct. 1671.

■ The remaining counts against defendants allege negligence in the supervision and training of the personnel responsible for precertification, and negligent

infliction of emotional distress. We take no position on whether these claims, too, constitute "alternative enforcement mechanisms,"[8] because we find that they indisputably create a threat of conflicting and inconsistent state and local regulation of the administration of ERISA plans. *See id.* at 656–58, 115 S.Ct. 1671 (noting that "the basic thrust of the preemption clause, then, was to avoid a multiplicity of regulation in order to permit the nationally uniform administration of employee benefit plans"). Different states could apply different standards for what constitutes a negligent precertification training or supervisory practice. This in turn could affect how defendants carry out their claims assessment duties, by requiring different administrative procedures in different jurisdictions. The preemption clause was designed to avoid precisely such a result. *See, e.g., FMC Corp. v. Holliday,* 498 U.S. 52, 60, 111 S.Ct. 403, 112 L.Ed.2d 356 (1990) (calling for preemption to avoid "patchwork" regulation and inefficient benefit programs); *Shaw v. Delta Air Lines, Inc.,* 463 U.S. 85, 99–100, 103 S.Ct. 2890, 77 L.Ed.2d 490 (finding law preempted because it introduced threat of conflicting state law that would increase administrative burden on plan administrators); *see also* 120 Cong. Rec. 29197 (1974) (describing preemption as the "crowning achievement" of ERISA and stating that its purpose is to "eliminat[e] the threat of conflicting and inconsistent State and local regulation") (statement of co-sponsor Rep. Dent).[9]

## V.

### Conclusion

We conclude that ERISA § 514 preempts the state tort claims leveled in this case against these defendants. The

---

8. Arguably, the supervisory and training aspects may be characterized as a step removed from the process of assessing claims for benefits.

9. Because the emotional distress claim obviously piggybacks on the facts underlying the other claims, which are preempted, the emotional distress claim, too, is preempted.

8

decision of the district court is therefore *affirmed.*[10]

---

**10.** Although there has been no finding that the utilization review was negligent in this case, we recognize that the practical result of our decision is that no significant state or federal remedy exists for plan participants injured by the negligence of utilization review firms and insurers making quasi-medical decisions in the course of processing claims for payment of benefits. As we have stated before, it is the job of Congress and not this court to provide for such a remedy if it sees fit. *See Turner v. Fallon Community Health Plan, Inc.,* 127 F.3d 196, 199–200 (1st Cir. 1997). Moreover, as the district court suggested, plaintiffs should challenge an adverse utilization review decision *immediately* and not wait until suffering physical injury.